## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ISAIAH SMITH, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Case No. 3:20cv794(VLB) |
| | : | |
| K. BARONE, ET AL., | : | |
|     Defendants. | : | |

### INITIAL REVIEW ORDER

The plaintiff, Isaiah Smith ("Smith"), currently resides in New Haven, Connecticut.  He has filed a civil rights complaint against Warden K. Barone, Commissioner Rollin Cook, Offender Classification and Population Management Director Dave Miaga ("OCPM Director Miaga"), Captain Claudio, Lieutenant Brown, Nurse Jane Doe and Correctional Officers Orcutt and John Doe(s). Compl., ECF No. 1.  For the reasons set forth below, the Court will dismiss the complaint in part.

### I.  Standard of Review

Pursuant to 28 U.S.C. § 1915A(b), the Court must review prisoner civil complaints against governmental actors and "dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief."  *Id.*  This standard of review "appl[ies] to all civil complaints brought by prisoners against governmental officials or entities regardless of

whether the prisoner has paid [a] filing fee."  *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004) (internal quotation marks and citation omitted).

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although detailed allegations are not required, a complaint must include enough facts "to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).  A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,'" does not meet the facial plausibility standard.  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

It is well-established that "*[p]ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'"  *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).  However, notwithstanding this liberal interpretation, a *pro se* complaint will not survive dismissal unless the factual allegations meet the plausibility

**2**

standard.  See, e.g., *Fowlkes v. Ironworkers Local* 40, 790 F.3d 378, 387 (2d Cir. 2015).

## II. <u>Facts</u>

In October 2019, prison officials held a hearing at Cheshire Correctional Institution to determine whether to place Smith in the Chronic Discipline Program due to his having received a series of disciplinary reports within a six-month period.  Compl., Doc. No. 1, at 5 ¶ 19.  Warden Buttrix and OCPM Director Miaga approved the recommendation for Smith's placement in the Chronic Discipline Program and on November 8, 2019, prison officials transferred Smith to the MacDougall Building at MacDougall-Walker Correctional Institution to begin phase 1 of the Program.  *Id.* ¶¶ 19-20.  During his confinement in phase 1, prison officials required Smith to eat in his cell, permitted Smith to recreate outside five days per week and to shower three days per week, prohibited him from using electronics and limited him to possessing five letters in his cell at one time.  *Id.* ¶ 21.  At times, Smith could smell unpleasant odors emanating from the toilet in his cell as he ate his meals.  *Id.*

On November 24, 2019, Warden Barone and OCPM Miaga approved Captain Claudio's recommendation that Smith move to phase 2 of the Chronic Discipline Program located in Q-Pod Unit of the MacDougall building.  *Id.* ¶¶ 21-22.  During his confinement in phase 2, Smith endured some of the same conditions that he had endured in phase 1 but was also permitted to possess a radio, eat one meal outside of his cell per day and leave his cell without being handcuffed and

shackled.  *Id.* at 6 ¶ 23.  An inmate is required to remain in phase 2 of the Chronic Discipline Program for sixty days.  *Id.*  On January 22, 2020, Smith completed phase 2 of the Program and Warden Barone and OCPM Miaga approved Smith's transfer to N-Pod Unit in general population.  *Id.* ¶ 24.

On February 17, 2020, Smith received a disciplinary report after medical staff members observed new tattoos on his right arm.  *Id.* ¶ 26.  When Smith refused to permit Lieutenant Brown to photograph his tattoos, Lieutenant Brown and several correctional officers performed a controlled strip search on Smith.  *Id.* ¶ 27.  During the search, Smith noted that he was uncomfortable being strip-searched by a female lieutenant.  *Id.*  Lieutenant Brown ordered other officers involved in search to take photographs of Smith's tattoos.  *Id.* at 7 ¶ 29.  After the search, Lieutenant Brown ordered officers to place Smith on in-cell restraints even though Smith was not being disruptive.  *Id.*

In-cell restraints include handcuffs, leg shackles and a tether chain around the inmate's waist that connects the handcuffs and leg shackles.  *Id.* ¶ 30.  The officers applied the restraints in such a way that Smith could not defecate or straighten his spine.  *Id.* ¶ 33.  Smith also experienced pain in his back and to bruises to his wrists.  *Id.*  To protest the tight application of the restraints, Smith covered the window in the door of his cell.  *Id.* ¶ 34.  Lieutenant Brown returned to Smith's cell and ordered Smith to remove the window covering and to sit on his bunk.  *Id.* ¶ 35.  Smith complied with both orders.  *Id.*  Lieutenant Brown then stripped Smith of his clothes, dressed him in a Ferguson gown, applied restraints

4

to his ankles and wrists as he lay on his bunk, provided him with a blanket and placed him on Behavior Observation Status.  *Id.*

Later that day, correctional officers and a nurse returned to Smith's cell to check the restraints.  *Id.* ¶ 40.  Smith complained that the restraints were too tight. *Id.*  Nurse Jane Doe checked the restraints but did not loosen them.  Before she left Smith's cell, she removed his Ferguson Gown and left him completely nude. *Id.* ¶ 41.  Prison officials subsequently downgraded Smith from four-point restraints to in-cell restraints.  *Id.* ¶ 42.  Correctional Officer John Doe videotaped this process.  *Id.*

After his release from in-cell restraints, Smith served time in punitive segregation.  *Id.* at 9 ¶ 43.  Prison officials transferred Smith from the restrictive housing unit to Q-Pod Unit until his disciplinary report cleared.  *Id.*  Prison officials subsequently transferred Smith from Q-Pod Unit to N-Pod Unit.  *Id.*

On March 8, 2020, Smith received a disciplinary report for flagrant disobedience for arguing with Correctional Officers Mendes and Andreas.[1]  *Id.* ¶ 44.  After officers escorted Smith to the restrictive housing unit, he learned that officials claimed he had not completed Phase 2 of the Chronic Discipline Program.  *Id.* ¶ 45.  Smith became upset, voiced his frustration and received two additional disciplinary reports for threats.  *Id.* ¶ 46.  On March 21, 2020, prison

---

[1]  Because Smith did not include Correctional Officer Mendes or Correctional Officer Andreas in the caption on page one of the complaint as required by Rule 10(a), Fed. R. Civ. P., neither officer is listed as a defendant on the docket.  It is unnecessary to add these correctional officers as defendants because the Court intends to sever and dismiss the allegations that pertain to their conduct.  Smith may pursue any claims against these officers in a separate action.

officials transferred Smith to the Walker Building to re-start Phase 2 of the Chronic Discipline Program under the supervision of OCPM Miaga. *Id.* ¶¶ 48-49. Prison officials did not hold a hearing prior to returning Smith to the Chronic Discipline Program. *Id.*

III. <u>Discussion</u>

Smith asserts Eighth Amendment excessive force and conditions of confinement claims, Fourth Amendment unreasonable search and privacy claims, a First Amendment retaliation claim and Fourteenth Amendment procedural due process claim. Smith sues the defendants in their individual capacities and seeks monetary damages and declaratory and injunctive relief.

A. <u>Declaratory Relief</u>

Smith seeks a declaratory judgment that the defendants violated his rights under the First, Fourth and Eighth Amendments. Under the doctrine of *Ex parte Young,* 209 U.S. 123 (1908), a plaintiff may seek prospective injunctive and declaratory relief to address an ongoing or continuing violation of federal law or a threat of a violation of federal law in the future. *See In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir. 2007); *Ward v. Thomas*, 207 F.3d 114, 120 (2d Cir. 2000). Smith does not assert an ongoing violation of his constitutional rights by the defendants. The incidents occurred during a period from November 2019 to March 2020. A declaration that the defendants violated Smith's rights under the federal constitution in the past is barred by the Eleventh Amendment. *See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S.

139, 146 (1993) (the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past"); *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young* . . . to claims for retrospective relief") (citations omitted).  Accordingly, the request for declaratory relief is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

      2.   <u>Injunctive Relief</u>

Smith seeks an order permanently enjoining the defendants from engaging in the unlawful conduct and practices described in the complaint.  An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation omitted).   To warrant preliminary injunctive relief, the moving party must demonstrate (a) that he or she will suffer "irreparable harm" in the absence of an injunction, and (b) either (1) a "likelihood of success on the merits or (2) sufficiently serious questions going to the merits [of the case] to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary injunctive relief."  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir. 2011) (internal quotation marks omitted).  If a party seeks a permanent injunction, he or she "must demonstrate (1) irreparable harm ... and (2) actual success on the merits." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012).  Thus, the standard for a permanent injunction is similar to the standard for a preliminary injunction, but a plaintiff must show actual success rather than a likelihood of success.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546

7

n.12 (1987).

The Second Circuit has held that an inmate's request for prospective injunctive relief from correctional staff in connection with conditions of confinement at a particular correctional institution becomes moot when the inmate is discharged from that institution, is transferred to a different institution or has received the relief requested. *See Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed"); *Sheppard v. Roberts*, No. 3:20-CV-875 (VAB), 2020 WL 6119422, at *12 (D. Conn. Oct. 16, 2020) ("When a prisoner I released from custody, claims for injunctive relief against prison officials become moot.") (citations omitted).  As indicated above, Smith has been discharged from the Department of Correction.  Thus, the request seeking injunctive relief relating to conditions of confinement at MacDougall-Walker Correctional Institution is moot and is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

C.    <u>Individual Capacity Claims – Cook, Orcott and Doe (s)</u>

Smith does not mention Commissioner Cook or Correctional Officer Orcott other than in the caption on the first page of the complaint and the description of parties.  The only allegation regarding the conduct of Correctional Officer Doe(s) is that he videotaped Smith's removal from four-point restraints.  As such, he has not alleged the direct, personal involvement of Commissioner Cook, Officer Orcutt or Officer Doe(s) in the violations of his federally or constitutionally protected rights.  The claims asserted against Commissioner Cook, Officer Orcutt

8

and Officer Doe(s) in their individual capacities are dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

      D.    <u>Individual Capacity Claims – First Amendment</u>

      Smith contends that in retaliation for his verbal complaint about Lieutenant Brown having strip-searched him, Brown placed him on in-cell restraints.  The Second Circuit has "instructed district courts to "'approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.'"  *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003)).  Retaliation claims "stated in wholly conclusory terms" are insufficient.  *Id.* (internal quotation marks and citations omitted).

      To plead a First Amendment retaliation claim, an inmate must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Dolan*, 794 F.3d at 294 (internal quotation marks and citation omitted).  "An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'"  *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Davis*, 320 F.3d at 353).

      An inmate's informal complaints or requests as well as formal grievances

"constitute protected activity under the First Amendment." *McKethan v. New York State Dep't of Corr. Servs.*, No. 10 CIV. 3826 NRB, 2011 WL 4357375, at *6 (S.D.N.Y. Sept. 16, 2011) (citing *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996)).  With regard to oral or verbal complaints, "the Second Circuit has yet to articulate a bright line rule regarding constitutionally protected oral speech by an inmate." *Booker v. Griffin*, No. 16-CV-00072 (NSR), 2018 WL 1614346, at *17 (S.D.N.Y. Mar. 31, 2018) (citations omitted).

Those courts that have considered whether a verbal grievance or complaint constitutes protected speech have concluded that verbal confrontations or arguments between a prisoner and a correctional officer do not constitute protected speech. *See Cosby v. McDonald*, No. 3:20CV432(MPS), 2020 WL 5026550, at *6-7 (D. Conn. Aug. 25, 2020) ("plaintiff's verbal argument with CTU Officer McDonald in connection with his request for a new pair of boxer shorts and an undershirt [did not] constitute[] the exercise of protected speech") (citing *McIntosh v. United States*, No. 14-CV-7889 (KMK), 2016 WL 1274585, at *26–27 (S.D.N.Y. Mar. 31, 2016) (observing that "courts in the Second Circuit and others have distinguished between unambiguously protected activity and situations where an inmate verbally confronts a prison official.") (collecting cases).

Here, it is difficult to discern whether Smith's complaint about being strip searched by a female correctional official constituted a verbal confrontation or challenge to an order issued by Lieutenant Brown or a verbal grievance about the nature of the strip search performed by Brown.  *See, e.g.*, *Garcia v. Semple*, 2019

WL 5597771, at *17 (D. Conn. Oct. 30, 2019) ("Although, not all oral speech by an inmate constitutes protected activity, some courts within the Second Circuit have determined that oral complaints about the conduct of prison officials or conditions of confinement may constitute protected speech in the context of a First Amendment retaliation claim.") (citing *McIntosh v. United States*, 2016 WL 1274585, at *26 (S.D.N.Y. Mar. 31, 2016) (collecting cases)).  The Court will permit the First Amendment retaliation claim to proceed against Lieutenant Brown for further development of the record.

### D.    Individual Capacity Claims – Fourth Amendment

The Court construes Smith's allegations to assert two Fourth Amendment privacy claims.  Smith challenges both the controlled strip search performed by or in the presence of Lieutenant Brown and the actions of Jane Doe Nurse in removing the Ferguson Gown from his body and leaving him completely naked after officers had placed him in four- point restraints on the bunk in his cell.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  In *Harris v. Miller*, 818 F.3d 49, 62 (2d Cir. 2016), the Second Circuit "reiterate[d] that inmates retain a limited right of bodily privacy under the Fourth Amendment."

Evaluating a claim that prison officials or officers infringed on an inmate's "right to bodily privacy" requires "a two-part inquiry: (1) First, the court must determine whether the inmate has "'exhibit[ed] an actual, subjective expectation

of bodily privacy'"; and (2) second, the court must determine "'whether the prison officials had sufficient justification to intrude on [the inmate's] fourth amendment rights.'" *Id.* (quoting *Covino v. Patrissi,* 967 F.2d 73, 77-78 (2d Cir.1992)).  Under the second inquiry, a court considers four factors in determining whether an isolated search was unreasonable because it infringed on an inmate's right of bodily privacy: "(1) the scope of the intrusion; (2) the manner in which it was conducted; (3) the justification for initiating it; and (4) the place in which it was conducted." *Harris*, 818 F.3d at 63 (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). A strip search is unconstitutional under the Fourth Amendment "if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish." *Jean–Laurent v. Wilkerson,* 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006) (citations omitted).

As to the first inquiry, there is no dispute that a visual body cavity search is a "serious invasion of privacy." *Harris*, 818 F.3d at 58 (quoting *Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 344-45 (2012) (internal quotation marks omitted)).  Furthermore, strapping an inmate's limbs to a bunk without providing the inmate with clothes or a blanket may be construed as a serious invasion of privacy as well.  Thus, for purposes of this ruling only, the Court will assume that Smith had a subjective expectation of privacy in both the controlled strip search and his placement in four-point restraints without a Ferguson Gown.

As to the second inquiry, Smith challenges the scope of the strip search, particularly the fact that Lieutenant Brown, a female officer was present for and/or

participated in the controlled strip search.  Smith also challenges the justification for the search.  The Court concludes that Smith has stated a plausible Fourth Amendment claim regarding the controlled strip search performed by or in the presence of Lieutenant Brown on February 17, 2020.

The Court cannot discern a legitimate justification for leaving Smith in four-point restraints without a gown or a blanket to cover his naked body.  Thus, the Court concludes that Smith has asserted sufficient facts to meet the second part of the Fourth Amendment bodily integrity inquiry.  This Fourth Amendment privacy claim will proceed against Nurse Jane Doe in her individual capacity.

E.    Individual Capacity Claims - Eighth Amendment - Excessive Force

Smith alleges that Lieutenant Brown subjected him to excessive force when he directed correctional officers to place him on in-cell restraints even though he had followed Brown's prior orders and had not been disruptive.  In *Hudson v. McMillian*, 503 U.S. 1 (1992), the Supreme Court established the minimum standard to be applied in determining whether force by a correctional officer against a sentenced inmate states a constitutional claim under the Eighth Amendment in contexts other than prison disturbances.  When an inmate claims that excessive force has been used against him by a prison official, he has the burden of establishing both an objective and subjective component to his claim. *See Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

To meet the objective component, the inmate must allege that the defendant's conduct was serious enough to have violated "contemporary

standards of decency." *Hudson*, 503 U.S. at 8 (internal quotation marks and citation omitted).  The extent of the inmate's injuries as a result of the defendant's conduct is not a factor in determining the objective component. *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) ("core judicial inquiry" is "not whether a certain quantum of injury was sustained," but rather whether unreasonable force was applied given the circumstances); *Hudson*, 503 U.S. at 9 ("[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated" irrespective of whether significant injury is present).

The subjective component requires the inmate to show that the prison officials acted wantonly and focuses on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).  The court considers factors including "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7 (internal quotations and citation omitted).

When reviewing a claim for use of restraints, "the court must consider the individual circumstances surrounding the use of restraints, including the length of time restraints were imposed and the objective sought to be served." *Davis v. Rinaldi*, No. 3:19-CV-504(CSH), 2019 WL 7879729, at *10 (D. Conn. Oct. 31, 2019)

14

(citation and quotation marks omitted).  Maintaining prison order and security is a legitimate penological objective. Thus, using restraints to achieve that objective, without more, is not a constitutional violation. *Shehan v. Erfe*, No. 3:15-cv-1315(MPS), 2017 WL 53691, at *9 (D. Conn. Jan. 4, 2017); *see Wells v. Stafford*, No. 3:13-cv-1349(RNC), 2015 WL 1471597, at *3 (D. Conn. Mar. 31, 2015) (whether use of restraints can be considered use of excessive force depends on the reason restraints were applied).

Smith alleges that after he underwent a controlled strip search, Lieutenant Brown issued an order directing officers to place him on in-cell restraints.  Smith states that he was not being disruptive and was compliant with all staff members. Thus, Smith contends that his placement on restraints did not constitute a good faith effort to maintain or restore discipline but was intended to cause him harm or to punish him for complaints that he had voiced about the strip search performed by Lieutenant Brown.  The Court will permit the Eighth Amendment excessive force claim to proceed against Lieutenant Brown in her individual capacity.

F.    Individual Capacity Claims – Eighth Amendment – Conditions

Although a sentenced inmate may experience conditions that are "restrictive or even harsh," the Eighth Amendment prohibits the imposition of conditions that "involve the wanton and unnecessary infliction of pain" or violate "contemporary standard[s] of decency."  *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (citation omitted).  To state a claim of deliberate indifference to health

or safety due to unconstitutional conditions of confinement, an inmate must demonstrate both an objective and a subjective element.  To meet the objective element, the inmate must allege that he was incarcerated under a condition or a combination of conditions that resulted in a "sufficiently serious" deprivation of a life necessity or a "human need[]" or posed "a substantial risk of serious harm" to his health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Rhodes*, 452 U.S. at 347.  The Supreme Court has identified the following basic human needs or life necessities of an inmate: food, clothing, shelter, medical care, warmth, safety, sanitary living conditions, and exercise.  *See Wilson v. Seiter*, 501 U.S. 294, 304; *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *Rhodes,* 452 U.S. at 348.  To meet the subjective element, an inmate must allege that the defendants possessed culpable intent; that is, the officials knew that he faced a substantial risk to his or her health or safety and disregarded that risk by failing to take corrective action.  *See Farmer*, 511 U.S. at 834, 837.

### 1.     Phase 1 and Phase 2 of Chronic Discipline

Smith includes a description of various conditions of confinement to which he was exposed during confinement in phase 1 of the Chronic Discipline Program for three weeks and in phase 2 of the Chronic Discipline Program for eight weeks. The conditions described by Smith, showers three days a week, recreation five days a week, no congregate meals and restrictions on property items that could be maintained in Smith's cell, do not rise to the level of deprivations of basic human need or life necessity.  Nor did the conditions subject Smith to a serious

risk of harm to his health or safety.  The claim that Captain Claudio, Warden Barone and OCPM Miaga subjected Smith to restrictive or harsh conditions during his confinement in phases one and two of the Chronic Discipline Program in violation of the Eighth Amendment are dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### 2.   Application of In-Cell Restraints

Smith alleges that Lieutenant Brown either applied or supervised the application of the in-cell restraints to his wrists, ankles and belly in such a way as to make it impossible for him to sit on and use the toilet and to cause him to experience pain in his back and bruises to his wrists.  Smith does not allege how long he was held in in-cell restraints but suggests that it was less than twenty-four hours.  The Court will permit this Eighth Amendment conditions of confinement claim to proceed for further development of the record.

### 3.   Tight Four-Point Restraints

Smith claims that when Nurse Jane Doe checked the four-point restraints on his wrists and ankles, he complained that the restraints were very tight.  Nurse Jane Doe did not adjust the restraints.  Smith does not indicate whether he experienced any injuries due to the tight restraints.  The Court will permit this Eighth Amendment claim to proceed for further development of the record.

### E.   Remaining Claims – March 2020 Incidents

Smith alleges that after he returned to general population on March 8, 2020, he received a disciplinary report for flagrant disobedience due to a dispute that he had with Officers Mendez and Andreas.  Smith became upset when he

17

received the disciplinary report and learned that he had been accused of failing to complete the Chronic Discipline Program in January 2020 and received two additional disciplinary reports for verbal threats. Captain Claudio confirmed that Smith would be placed back in phase 2 of the Chronic Discipline Program because he had not previously completed the Program. On March 21, 2020, prison officials transferred Smith to the Walker Building to begin phase two of the Chronic Discipline Program under the supervision of OCPM Miaga.

Smith raises a Fourteenth Amendment procedural due process claim. He contends that he did not receive a hearing prior to his placement back in the Chronic Discipline Program. Smith also suggests that his placement back in phase 2 of the Chronic Discipline Program might have been retaliatory. The Court concludes that the claims asserted in connection with Smith's receipt of three disciplinary reports in early March 2020 and his placement in the Chronic Discipline Program are improperly joined in this action.

Federal Rule of Civil Procedure 20 permits joinder of multiple defendants in one action only if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions and occurrences, and any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). The Court approaches the determination of "[w]hat [might] constitute the same transaction or occurrence . . . on a case by case basis." *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008) (citation

omitted).   In interpreting the terms transaction or occurrence as used in Rule 13(a), Fed. R. Civ. P., the Second Circuit has observed that whether a counterclaim arises out of the same transaction as the original claim depends upon an assessment of "the logical relationship between the claims" and a determination of whether the "essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir. 1978) (citations omitted).   The Court applies an analogous interpretation to the terms transaction or occurrence as used in Rule 20(a)(2).

Rule 21 of the Federal Rules of Civil Procedure provides that a court "may sever any claim against a party" pursuant to a motion filed by a party to the action or on its own.   Fed. R. Civ. P. 21.   In exercising its discretion to decide whether to sever a claim, a court should weigh the following factors: "(1) [do] the claims arise out of the same transaction or occurrence; (2) [do] the claims present some common question of law or fact; (3) [would] settlement of the claims or judicial economy be facilitated; (4) will prejudice [] be avoided; and (5) [will] different witnesses and documentary proof [be] required for the separate claims." *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 263–66 (D. Conn. 2012) (citation omitted).

The allegations pertaining to the incidents that occurred in March 2020 regarding the disciplinary reports received by Smith and his return to phase 2 of the Chronic Discipline Program do not arise out of the same transaction or

occurrence as the allegations arising from Smith's placement on in-cell and four-point restraints, the controlled strip search or the conditions of confinement experienced by Smith during his placement on in-cell and four-point restraints in February 2020.  The facts related to the First Amendment retaliation claim, the Fourth Amendment search and privacy claims and the Eighth Amendment excessive force and conditions of confinement claims are not all common to the facts related to the Fourteenth Amendment due process claims arising from the issuance disciplinary reports to Smith and his placement in the Chronic Discipline Program without a hearing.  Thus, different witnesses, testimony and documentary evidence would be required to prove the separate sets of claims at trial.  The Court concludes that the sets of unrelated allegations and defendants are not properly joined in this action and the relevant factors favor severance of these claims.  *See Lindsay v. Semple*, No. 3:19-CV-751 (JCH), 2019 WL 3317320, at *10–11 (D. Conn. July 24, 2019) (severing and dismissing without prejudice all claims unrelated to due process claim as improperly joined in violation of Fed. R. Civ. P. 20)(citing *Wilson v. McKenna*, No. 3:12-cv-1581 (VLB), 2015 WL 1471908, at *6 (D. Conn. Mar. 31, 2015) (advising plaintiff that improperly joined claims must be pursued in separate actions).

Pursuant to Rules 20 and 21 of the Federal Rules of Civil Procedure, the Court will sever and dismiss without prejudice the Fourteenth Amendment due process claims arising from Smith's receipt of three disciplinary reports and his placement in phase 2 of the Chronic Discipline Program in March 2020 as

asserted against Captain Claudio and OCPM Miaga.  If Smith seeks to pursue these claims, he must do so by filing a separate lawsuit.

**ORDERS**

The Court enters the following orders:

(1)    The requests for declaratory and injunctive relief, all claims asserted against Commissioner Cook, Correctional Officer John Doe(s) and Correctional Officer Orcutt and the Eighth Amendment conditions of confinement claims pertaining to Smith's confinement in Phases 1 and 2 of the Chronic Discipline Program from November 2019 to January 2020 are DISMISSED pursuant to 28 U.S.C. § 1915A(b)(1).

The First Amendment retaliation claim will proceed against Lieutenant Brown in her individual capacity, the Fourth Amendment deprivation of privacy claim will proceed against Nurse Jane Doe in her individual capacity, the Fourth Amendment unreasonable search claim will proceed against Lieutenant Brown in her individual capacity, the Eighth Amendment  conditions of confinement claims arising from Smith's placement on four-point restraints will proceed against Nurse Jane Doe in her individual capacity and the Eighth Amendment excessive force claim and conditions of confinement claims arising from Smith's placement on in-cell restraints will proceed against Lieutenant Brown in her individual capacity.

The Fourteenth Amendment due process claims arising from Smith's receipt of three disciplinary reports and his placement in Phase 2 of the Chronic

Discipline Program in March 2020 as asserted against Captain Claudio and OCPM Miaga are SEVERED and DISMISSED pursuant to Rules 20 and 21 of the Federal Rules of Civil Procedure.  If Smith seeks to pursue these claims and the requests for damages and injunctive relief related to these claims as well as his claims against Correctional Officers Mendez and Andreas (who are not named as defendants in the caption of the complaint), he must do so by filing a separate lawsuit.

Accordingly, all claims asserted against Commissioner Cook, Warden K. Barone, OCPM Director Miaga, Captain Claudio, Correctional Officer Orcutt and Correctional Officer John Doe(s) are DISMISSED.

(2)     Within twenty-one (21) days of this Order, the Clerk shall verify the current work address of Lieutenant Brown and mail a copy of the complaint, this order, and a waiver of service of process request packet to her in her individual capacity at her confirmed address.  On the thirty-fifth (35th) day after mailing, the Clerk shall report to the Court on the status of the request.  If Defendant Brown fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service and Defendant Brown shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

The Court informs Smith that the Clerk cannot serve the complaint on Nurse Jane Doe because he has not provided her first or last name.  Smith will have ninety (90) days from the date of this order to conduct discovery and file

a notice identifying Nurse Jane Doe by her first and last name. The Court will dismiss the claims against Nurse Jane Doe if Smith does not provide her first and last name within the time specified.

(3)   Defendant Brown shall file her response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to her.  If Brown chooses to file an answer, she shall admit or deny the allegations and respond to the cognizable claims recited above.  She may also include any and all additional defenses permitted by the Federal Rules.

(4)   Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within six months (180 days) from the date of this order. Discovery requests need not be filed with the Court.

(5)   All motions for summary judgment shall be filed within seven months (210 days) from the date of this order.

(6)   If Smith changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court.  Failure to do so can result in the dismissal of the case.  Smith should write PLEASE NOTE MY NEW ADDRESS on the notice.  If Smith has more than one pending case, he should indicate all case numbers in the notification of change of address.  Smith should also inform the attorney for the defendants of his new address.

(7)   The Clerk shall send a courtesy copy of the complaint and this order to the Connecticut Attorney General and to the DOC Legal Affairs Unit.

23

(8)      The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which will be sent to the parties by the Clerk.  The order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders.

SO ORDERED.

Dated at Hartford, Connecticut this 10th day of March, 2021.

_____/s/_____
Vanessa L. Bryant
United States District Judge

24